[750 NYS2d 236]

In the Matter of NORNEW, INC., Appellant, v FRANK B. MARSH, as Assessor of the Town of Poland, et al., Respondents.

Fourth Department, November 15, 2002

**APPEARANCES OF COUNSEL**

*Sullivan Oliverio & Gioia LLP,* Buffalo (*B.P. Oliverio* of counsel), for appellant.

*Erickson, Webb, Scolton & Hajdu,* Lakewood (*Paul V. Webb, Jr.,* of counsel), for respondents.

**OPINION OF THE COURT**

KEHOE, J.

This appeal arises in proceedings brought pursuant to article 7 of the Real Property Tax Law to challenge the tax assessment on petitioner's pipeline in the Town of Poland (Town), Chautauqua County. It occasions the first reported judicial construction of RPTL, article 5, title 5, which requires that oil and gas interests be assessed and taxed on the basis of "economic units" (RPTL 594 [1], [2]; *see* RPTL 590 [2]). The issue of first impression is whether the pipeline, which has never been connected, is a part of the same economic unit as petitioner's producing gas wells and associated gathering lines. If it is, then the pipeline may not be "separately assessed" by respondents, the Town taxing authorities (RPTL 594 [2]).

*Background*

Petitioner is the owner of multiple gas wells, rights-of-way and pipelines in the Town. Respondents are the Town Assessor and members of the Town Board of Assessment Review. This proceeding concerns two tax parcels known as PS4 and PS5. Those parcels are rights-of-way for two pipelines that were laid at the same time in the same trench. The pipelines extend about 4½ miles across the Town and collectively are known as the Falconer pipeline. Both pipelines run through both tax parcels. However, only one of the pipelines is directly at issue in these proceedings.

The subject pipeline is constructed of six-inch-diameter steel (steel pipeline). It extends from the proposed site of a compressor to be installed along County Highway 99 in the Town of Ellicott to its terminus at a pipeline owned by Norse Pipeline, LLC (Norse pipeline) in the Town of Poland. Parallel to the steel pipeline is another constructed of four-inch-diameter plastic (plastic pipeline). It runs from the vicinity of the Norse pipeline to the vicinity of the proposed compressor and on to the Jamestown Mason Industrial Park in the Town of Ellicott. The plastic pipeline was constructed to gather natural gas from petitioner's group of wells in the Towns of Poland and Ellicott and deliver the gas, without compression, westward to petitioner's local industrial or commercial customers, which currently number about 20. At the same time, petitioner planned to collect any "surplus" gas from such operations,

compress it, and transport it eastward through the steel pipeline to the Norse pipeline for ultimate distribution to non-local customers. According to the uncontroverted assertions of petitioner, regulations preclude it from using the steel pipeline to transmit gas from the Norse pipeline to petitioner's own local customers. The only permissible use of the steel pipeline is to collect gas from petitioner's local wells and deliver it to local customers or, in the event of a surplus of gas above the needs of such local users, to deliver such surplus to the Norse pipeline for ultimate delivery to nonlocal customers. Any gas so delivered must be carried at a higher pressure than the gas flowing through the Norse pipeline in order to prevent a backflow. Petitioner thus planned to install the compressor and operate the steel pipeline at a pressure of 720 pounds per square inch.

In July 1997, the State Public Service Commission (PSC) granted to Nornew Energy Supply, Inc. (NES), an entity related to petitioner, permission to construct the steel pipeline. The PSC's order referred to the proposed steel pipeline as a "transmission" line but acknowledged that its purpose would be to "gather gas from existing and future company natural gas wells for transport to the existing [Norse pipeline]." NES constructed the pipelines by October 1998, assigning them to petitioner the following year. Gas flowed through the plastic pipeline beginning November 1, 1998. Since then, petitioner's wells have not produced a surplus of gas beyond the amount necessary to meet the needs of petitioner's local customers at the terminus of the plastic pipeline. Therefore, the planned compressor has never been built and the steel pipeline, which was built as a "speculative investment," has never been used to deliver gas to the Norse pipeline and on to nonlocal customers.

### The Contested Assessments And These Proceedings

Petitioner was notified of its assessment on each parcel for the tax year 2000. On PS4, the assessment was $239,497; on PS5, the assessment was $348,945. The assessments pertained to the steel pipeline only and not to the rights-of-way and other improvements. The basis for the values arrived at by respondent Town Assessor is not disclosed by the record.

Petitioner filed complaints with the Board of Assessment Review with respect to both assessments. Each complaint alleged that the assessment was excessive to the extent it exceeded $0. Accompanying each complaint was a letter-

memorandum asserting that the steel pipeline is "part of an economic unit associated with the extraction of natural gas from wells owned by [petitioner] and, accordingly, cannot be separately assessed and taxed." Petitioner identified the "economic unit" in question as one whose "point of sale or delivery * * * is the Jamestown Mason Industrial Park or the [Norse] Pipeline." Petitioner thus asserted that its steel pipeline is part of the same "economic unit" as its wells and plastic pipeline. The Board of Assessment Review denied both complaints.

Pursuant to RPTL article 7, petitioner commenced two proceedings against respondents, one for each tax parcel. Each petition alleged an excessive assessment, asserted that the full value of the tax parcel is $0, and sought a reduction of the assessment to that extent.

Subsequently, petitioner moved for summary judgment, seeking a determination as a matter of law that the steel pipeline is, as defined by RPTL 590 (2), part of an "economic unit" associated with the extraction and sale of natural gas from petitioner's wells and thus is immune from separate assessment pursuant to RPTL 594 (2). The motion was opposed by affidavit of respondent Town Assessor, who averred that petitioner "gathers gas from its wells in the Town of Poland and delivers the gas to points of sale at the Mason Industrial Park and the Jamestown Water Treatment Plant with a four-inch plastic pipe, not the six-inch steel pipeline in question"; that the "steel pipeline is a high pressure transmission line which * * * was constructed on speculation and has never been used in connection with the Petitioner s 'Economic Unit' to collect or deliver gas from these wells to the point of sale"; that petitioner "never installed a compressor which would even allow excess gas from those wells to be delivered into the high pressure Norse Pipeline"; that respondents thus "did not consider this six-inch steel pipeline to be part of the 'Economic Unit' as that term is defined in [RPTL] 590 because the steel pipeline has never been used nor is it necessary to collect and deliver gas from the Petitioner s wells which make up the 'Economic Unit' to the point of sale at the Mason Industrial Park"; and that "the six-inch steel pipeline * * * [thus] must be taxed separately." Respondent Town Assessor averred that the "four-inch plastic pipe was considered part of the 'Economic Unit' for these wells and was not separately assessed" and that, "if in the future the Petitioner incorporates the six-inch steel pipeline into its 'Economic Unit', it will be taxed as part of that Unit and not separately."

In denying petitioner s motion for summary judgment, Supreme Court concluded that "[a]n unused pipeline cannot be said to be 'necessary' to the delivery or sale of gas [as required by RPTL 590 (2)]. Therefore, this pipeline is not part of the economic unit and may be assessed separately."

*Relevant Statutes*

"§ 590. Definitions * * *

"2. *'Economic unit' means all the real property subject to taxation and assessed pursuant to this title associated with the exercise of oil and gas rights, including* the unextracted oil and gas, oil and gas rights and *any and all equipment, fixtures and pipeline, regardless of size, length or pressure rating[,] necessary to drill, mine, operate, develop, extract, produce, collect, deliver or sell the oil or gas to a point of sale to a commercial purchaser or the pipeline or equipment of a user, including wells, well-head equipment, pipes, compressor stations, related equipment and buildings used to store equipment. Each economic unit may include either a single well and the associated property, or a group of wells and the associated property under common ownership and operated as a unit. No economic unit shall extend beyond the point of sale or where the gas or oil is delivered to the pipe or equipment of a user.*" (Emphasis added.)

"§ 594. Assessment of oil and gas economic units

"1. *Oil and gas economic units shall be assessed only in the manner provided in this title.* * * *

"2. Upon receipt of the appropriate unit of production values certified by the state board, each assessor shall compute and determine, in accordance with rules promulgated by the state board, the assessed value of oil and gas economic units located in that assessing unit. * * * Except as otherwise provided for in this subdivision and subdivision three of this section, *oil and gas economic units shall be assessed as follows: [setting forth a formula based on the actual production from that economic unit in the production year]. The value of all elements in an oil and gas economic unit shall be*

*deemed to be included in the value of such economic unit and shall not be separately assessed. Assessment of gas economic units shall be based on actual measured annual production during the life of the well or wells in that unit even though such annual production may be non-existent due to non-connection, non-completion, shut-in or other circumstances which prevent production of oil and/or gas* [subject to a limited exception based on imputed production and involving a minimum tax assessment for certain non- or low-producing economic units]. Upon completion of the second year minimum tax assessment, *a gas economic unit shall be assessed on actual measured annual production of gas."* (Emphasis added.)

### Legislative History And Other Authorities

RPTL, article 5, title 5 was originally enacted in 1981 (L 1981, ch 846, § 19), although its effective date was put off twice before it eventually became effective in 1984 (*see* L 1982, ch 66, § 1; L 1983, ch 639, § 1). It was enacted as part of a comprehensive overhaul of regulation of the oil and gas industries, in an attempt to encourage oil and gas development and production in response to the energy crisis of the 1970's (*see* Preamble, L 1981, ch 846, § 1). As originally enacted, title 5 was entitled "Oil and Gas Rights Lands." "Economic unit" was defined as "real property subject to taxation and assessed pursuant to this title, including the oil and gas and any and all equipment and fixtures necessary to extract and collect the oil and gas for sale to a commercial purchaser" (RPTL former 590 [3]). RPTL former 594 (1) provided that, "[u]pon the exercise of oil and gas rights resulting in oil and gas production, such rights shall be separately assessed in the manner provided in this title." RPTL former 594 (2) provided that "[t]he value of all pipes, pipelines, or other equipment used for the extraction and collection of oil and gas shall be deemed to be included in the value of the economic unit and shall not be separately assessed."

In approving the original statute, the Governor stated that the "bill amends the Real Property Tax Law to clarify the taxable status of oil and gas development rights" (Governor's Mem approving L 1981, ch 846, 1981 McKinney's Session Laws of NY, at 2629). A Senate Memorandum recited that the bill would "establish a uniform method of real property taxation

for oil and natural gas lands," and that localities would now be "authorized to levy a real property tax on oil and natural gas based upon production" (Senate Mem in Support, Bill Jacket, L 1981, ch 846). Memoranda of the State Division of Equalization and Assessment (Bill Jacket, L 1981, ch 846) recited that the statute was an outgrowth of "legislative concern for current assessment practices relating to oil and gas leases," and noted that the statute

> "governs the assessment and valuation of oil and gas rights in production. * * * As to oil and gas rights in production, new title 5 mandates the separate assessment of the rights and the land and provides a specific methodology for the valuation of the rights. * * * [N]ew title 5 requires that an economic approach be utilized for purposes of valuation thereby eliminating [the uncertainty of prior law]."

RPTL 590 (2) and 594 (2) took their present form as a result of 1985 amendments, the purposes of which were to provide "for the assessment and taxation of oil and gas production based on the income that oil and gas economic units generate in the course of their useful lives"; to establish that "oil and gas rights are only one of several elements comprising an economic unit[,] which is the taxable entity"; and to clarify "what may and may not be considered as property within an economic unit and thereby assessed pursuant to this title; that an economic unit ends at the point where the oil and gas is sold to a commercial user; * * * [and] that assessment shall be based on actual measured production" (Senate Mem in Support, Bill Jacket, L 1985, ch 869). It was further noted that the amendments cured the failure of the original enactment to define adequately "the scope of the taxable entity i.e. the economic unit * * * and the status of unexercised rights and non-producing wells" (id.).

A Memorandum of the State Department of Commerce (Bill Jacket, L 1985, ch 869) commended the 1985 amendments for providing "clarity and uniformity statewide in determining the assessed valuation of real property from which income is produced by the withdrawal therefrom and the sale of either oil or natural gas." The State Board of Equalization and Assessment Memorandum in Support (Bill Jacket, L 1985, ch 869) noted that the amendments clarified that the "condition[ ]" upon which the economic unit would be assessed meant the amount of production in the production year. That Memo-

randum also stated: "Exempt from taxation would be gas economic units which * * * are not connected to a transmission line; or * * * are not capable of production in commercially marketable quantities; or * * * have been plugged and abandoned" (*id.*).

A Memorandum of the Division of Equalization and Assessment (Bill Jacket, L 1985, ch 869) noted that, pursuant to the amendments, "the term 'transmission lines' is not included in the definition of an economic unit."

The Independent Oil & Gas Association of New York, a trade association, also submitted a Memorandum in Support of the bill (Bill Jacket, L 1985, ch 869). It lauded the amendments for assessing

> "oil and gas production based on the income the oil and gas units generate in the course of their useful lives. Oil and gas has no intrinsic economic value. Each resource must be captured, brought to the surface and delivered to a point of sale or use before it can earn income for the producer. Gas wells, in particular, which have no utility buyer, outlet or point of sale cannot (and do not) generate any income for the producer. Gas wells with no delivery point are shut-in and can lay dormant for years or indefinitely. Thus, a gas producer will always drill wells and install as part of the gas development project an integrated system of gas pipelines to deliver the gas to a sale point or place of use. It is at this point where the gas producer realizes an income stream for his investment and it is also the point at which Title 5 assessments on the stream of income come into play. Thus, the gas 'economic unit,' upon which Title 5 assessment practices are based, is the entire package of equipment, plant, pipeline and fixtures the producer installs to deliver the gas to a sale or use point. This concept, which is essential to the equitable administration of Title 5, is now clearly reflected in [the amendments]."

No reported decision addresses the issue raised herein or, indeed, even cites RPTL 590 or 594, although those statutes have existed in their current form since 1985. The statutory scheme is mentioned in several treatises, but most merely quote or paraphrase the provisions of the statutes (*see e.g.* 98 NY Jur 2d, Taxation and Assessment §§ 295, 317; 6 Real Property Service, New York § 61:13, at 20-22). Two treatises observe

that "[i]nterests in real property associated with the production of oil and gas are assessed and valued by methods that differ significantly from those normally used for interests in real property" (98 NY Jur 2d, Taxation and Assessment § 317; *see* 6 Real Property Service, New York § 61:13, at 20-21). Another states that, under title 5, oil and gas rights are to be "assessed in terms of economic units," "separately from all other interests in the property" (3 Comeau, Heckelman, Helm, New York Tax Analysis § 70.62 [3] [d], at VI-111).

Pursuant to RPTL 592 (3), the State Board of Real Property Services has promulgated regulations with respect to "Assessment of Oil and Gas Economic Units." Those regulations provide that, "[u]pon the exercise of oil and gas rights resulting in oil and gas production, such rights shall be separately assessed from any other interests in the property, on the basis of economic units, by the methodology set forth in this Part" (9 NYCRR 196.1 [a]).

A publication of the New York State Office of Real Property Services states that, in the early 1980's, the "separate assessment of oil and gas economic units for producing wells in New York State was mandated" (2 CCH State Tax Reporter, New York ¶ 29-047, at 9673). It further states: "Oil and gas producing properties are assessed as economic units. Economic units include all the real property subject to taxation and assessed in accordance with the RPTL. **Gathering lines** are included in determining economic units. However, **transmission lines** are not included" (*id.* at 9676 [emphasis in original]). That publication defines "Gathering Lines" as "[p]ipes used to transport oil or gas from the producing area to the main pipeline in the area. * * * If gas is used, the flow is continuous from the well head to the ultimate consumer or point of purchase" (*id.* at 9679-4). It defines "Transmission Lines" as "pipelines extending from a producing area to a refinery terminal or connecting to gathering lines or delivery point of purchase. These lines are used for longer distance transportation of gas" (*id.* at 9680).

## Analysis And Conclusions

Our analysis of the legislative history and other authorities constrains us to agree with petitioner that Supreme Court misconstrued the definition of economic unit contained in RPTL 590 (2). We conclude that the steel pipeline is part of the economic unit consisting of "a group of wells and the associated property under common ownership [of petitioner] and operated

as a unit" by petitioner, including "pipeline" and other "fixtures" and "equipment," "necessary to * * * collect, deliver or sell" natural gas "to a point of sale to a commercial purchaser or the pipeline or equipment of a user" (RPTL 590 [2]). We thus conclude that the steel pipeline is part of the same economic unit of which petitioner's wells and plastic pipeline are elements, and that it thus may not be assessed separately from that economic unit. Instead, the steel pipeline must be assessed and taxed along with the other elements of that economic unit, on the basis of the actual or imputed production of that unit. That result best accords with title 5, the overarching purpose of which is to prohibit assessment of oil and gas properties based on factors unrelated to production or based on the assessor's own subjective notions of value.

Contrary to respondents' contention, it is not determinative that the steel pipeline is not yet connected to petitioner's wells or other gathering lines and thus has not yet been used to deliver gas to Norse Pipeline, LLC, petitioner's anticipated commercial customer. The intended use of the steel pipeline nonetheless brings it within the definition of the economic unit. The statutory scheme and legislative history make clear that unproductive elements nonetheless constitute part of an economic unit and must be assessed based upon that unit's current production. If and when the steel pipeline is connected, it will carry surplus gas produced by petitioner's group of wells. The steel pipeline has no purpose other than to carry such gas. The steel pipeline is thus "associated" with that group of wells and no other (RPTL 590 [2]). Moreover, when connected, the steel pipeline will carry such gas to its "point of sale" to a "commercial purchaser" (*id.*). Thus, the steel pipeline is (or will be) a "gathering line," part of a network of such lines carrying gas directly from wells to (but no farther than) a transmission line owned by such commercial purchaser. The steel pipeline is not now, nor is it anticipated to be, a "transmission line" as defined by taxing authorities. It does not and will not "extend beyond the point of sale [to a commercial purchaser] or where the gas or oil is delivered to the pipe or equipment of a user" (*id.*). Rather, the steel pipeline lies and will continue to lie entirely on the production side of an anticipated point of sale, delivery, or use.

It is arbitrary of respondents to assess the steel pipeline separately from the only wells that eventually will or may supply gas to it. Respondents rely on the fact that the steel pipeline is not yet connected to the wells, even though it was built to be

so connected and is expected to be so connected eventually. Respondents acknowledge that, if the steel pipeline were currently connected to the wells in question, it would be part of that established economic unit and thus not subject to separate assessment. Respondents thus concede that, in that event, the assessment on the steel pipeline would effectively be reduced from nearly $600,000 to $0. We conclude that it is arbitrary to assess an unconnected pipeline associated with an established economic unit at a higher value than if it were connected. Although respondents argue that the steel pipeline was built as a "speculative" investment, any such speculation relates to the anticipated surplus of gas from the wells that are part of the established economic unit. The steel pipeline has no other anticipated purpose than to carry such gas. We see no basis in logic or in the statutory scheme for assessing an as-yet-unutilized part of the total investment at a higher value than it would be assessed if utilized.

The crux of respondents' argument and of the court's determination is that, because the steel pipeline is not connected to a supply of gas, it is not "necessary" to the delivery or sale of gas (RPTL 590 [2]). That argument ignores the unambiguous provisions of title 5 concerning oil and gas units and associated elements that are not currently in production. So long as "gas rights" have been "exercise[d]" (*id.*; *see generally* 9 Ops Counsel SBEA No. 33, at 71 [1988]), nonproductive wells and associated elements are nonetheless part of the economic unit and not subject to separate assessment, "even though such annual production may be non-existent due to non-connection, non-completion, shut-in or other circumstances which prevent production of oil and/or gas" (RPTL 594 [2]). We accord far more significance to the foregoing provisions of RPTL 594 (2) than to respondents' narrow interpretation of the term "necessary" set forth in RPTL 590 (2). Thus, based on our reading of title 5, we conclude that the term "necessary" means essential or intrinsic to a potential or prospective sale or delivery of gas as well as to an actual or ongoing one.

For the foregoing reasons, we conclude that the court erred in determining that the steel pipeline is not a part of the economic unit and thus may be separately assessed by respondents. Instead, we determine that, as a matter of law, the steel pipeline is real property associated with the extraction of natural gas from the group of wells owned by petitioner, to be assessed based on the actual or imputed production of such economic unit and not separately from it.

Accordingly, we conclude that the order should be reversed and petitioner's motion for summary judgment granted.

PINE, J.P., HURLBUTT, GORSKI and LAWTON, JJ., concur.

It is hereby ordered that the order so appealed from be and the same hereby is unanimously reversed on the law, with costs, and the motion is granted.